*Formatted for Electronic Distribution* *For Publication*

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF VERMONT

Filed & Entered
On Docket
February 23, 2018

_____

**In re:**
    **Brenda L. Vasquez,**      Chapter 7
        **Debtor.**      Case # 10-10806
_____

*Appearances:* John P. Riley, Esq.      Raymond J. Obuchowski, Esq.
        Montpelier, Vermont      Bethel, Vermont
        For the Debtor      As Former Chapter 7 Trustee

## MEMORANDUM OF DECISION
### DENYING TRUSTEE'S MOTION TO REOPEN CASE

      The former chapter 7 trustee has filed a motion asking the Court to reopen the instant case, which was closed approximately seven years ago, so he can administer a previously undisclosed personal injury claim recovery, based on a defective medical device, in the estimated amount of $45,000. The trustee argues all the essential elements of the Debtor's causes of action leading to the recovery existed prior to the date she filed her bankruptcy case, the claim was fully accrued as of the petition date, and her recovery is thus property of the bankruptcy estate. The Debtor opposes the trustee's motion. She argues, first, she had no knowledge of any defect in the device, and hence no interest in the personal injury recovery at the time she filed her chapter 7 bankruptcy petition and, second, the damages, pain, and suffering that gave rise to her monetary award occurred after she filed her bankruptcy case. In sum, the Debtor insists neither the trustee nor her creditors are entitled to the funds she received through her personal injury claim and consequently, no purpose that would be served by reopening the case.

      On December 13, 2017, the Court held an evidentiary hearing at which the Debtor testified.

      Based upon the record in this case, and for the reasons set forth below, the Court concludes the Debtor's recovery from her personal injury suit is not property of the bankruptcy estate and therefore, denies the trustee's motion to reopen this case.

## JURISDICTION

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Order of Reference entered on June 22, 2012. The Court declares the trustee's motion to reopen, and the Debtor's objection to the motion, create a core proceeding for purposes of 28 U.S.C. § 157(b)(2)(A) and (E), over which this Court has constitutional authority to enter a final judgment.

## LEGAL ISSUE PRESENTED

The legal issue presented in this contested matter is whether the Debtor had a sufficient interest in the defective medical device lawsuit on the date she filed this chapter 7 case to render it an asset of the bankruptcy estate and justify reopening this case.

## STIPULATED FACTS

On November 30, 2017, the parties filed a joint statement of uncontested facts (doc. # 22, the "JSUF"), which the Court hereby adopts. The Court finds the following facts from the JSUF to be uncontested and material to the trustee's motion to reopen (doc. # 14):

### *BANKRUPTCY CASE PROCEDURAL HISTORY*

1. On June 14, 2010, Brenda L. Vasquez (the "Debtor") filed for petition for relief under chapter 7 title 11 of the United States Code (the "Bankruptcy Code")[1] (JSUF # 1).
2. On or about June 14, 2010, Raymond Obuchowski was appointed interim trustee (the "Trustee') and served in that capacity until the case was closed on November 19, 2010 (JSUF # 2).
3. On June 14, 2010, the Debtor filed schedules and statements (doc. # 1, the "Schedules") setting forth her assets and liabilities, as required under Bankruptcy Rule 1007 and the Bankruptcy Code. She also filed a declaration concerning those documents, signed under the penalty of perjury, in which the Debtor declared she had read the Schedules and they were true and correct to the best of her knowledge, information, and belief (JSUF # 3).
4. On July 12, 2010, the Debtor testified at the meeting of creditors that she was personally familiar with the information contained in the Schedules, that she had read and signed the Schedules, that they were true and accurate, that she had disclosed all of her assets and liabilities, and that she did not have any claims against anyone and there was no one against whom she could seek a money recovery (JSUF ## 4, 5).
5. Based upon the Debtor's Schedules, and her testimony at the meeting of creditors, the Trustee filed a report of no distribution on July 12, 2010 (JSUF # 6).

---

[1] Title 11 of the United States Code is referred to herein as the Bankruptcy Code.

2

6. On November 3, 2010, the Court granted the Debtor a discharge (doc. # 10) and the case was closed by final decree (doc. # 12) on November 19, 2010 (JSUF # 7).

### *MEDICAL AND DEFECTIVE DEVICE LITIGATION HISTORY*

7. On or about October 24, 2005, physicians implanted in the Debtor a device known as a tension free vaginal tape (the "Defective Device") as a treatment for stress incontinence (JSUF # 8).

8. Following the surgery in October 2005, the Debtor continued to have issues relative to frequency, incontinence, and recurrent infection (JSUF # 9).

9. On June 2, 2009, approximately one year prior to filing her chapter 7 bankruptcy case, the Debtor sought medical treatment at Gifford Medical Center, regarding ongoing issues with stress and urge incontinence (JSUF # 9).

10. The Debtor's condition required further examination in March 2010. At that examination, her physicians recommended the Debtor return for a follow up visit in 3 months, but she failed to keep that latter appointment (JSUF # 9).

11. Beginning March 10, 2011, and continuing thereafter, the Debtor sought further medical advice regarding her recurring issues of urinary tract infection, urge incontinence, and other conditions, until physicians surgically removed a segment of the Defective Device on May 20, 2015 (JSUF # 10).

12. On or around March 1, 2013, the Debtor came to believe she might have a claim against all responsible parties, including, but not limited to, manufacturers and distributors of the Defective Device that was surgically implanted in the Debtor in October 2005, based on an advertisement she saw on television (JSUF # 11).

13. Later in March of 2013, the Debtor entered into a contract to retain three law firms to investigate, prepare, and prosecute any viable claim or suit the Debtor had for the injuries she suffered as a consequence of the Defective Device implanted in her (JSUF # 12).

14. On May 27, 2014, the Debtor, through her attorneys, The Potts Law Firm, filed a short form complaint against certain defendants (Ethicon, Inc. and Johnson & Johnson) in Civil Action No. 2:14-cv-17006 in the U.S. District Court for the Southern District of West Virginia. That short form complaint incorporated by reference the first amended master complaint in <u>In re: Ethicon, Inc., Pelvic Repair System Products Liability Litigation</u>, Case No. 2327(the "MDL case"), originally filed in November 2011 (JSUF # 13).

15. On June 26, 2014, the Debtor's case was transferred and incorporated into the MDL (JSUF # 14).

14. Ultimately, an agreement was reached in the MDL case to settle the claims against certain parties

who manufactured transvaginal mesh and bladder sling products, including the type of device implanted in the Debtor (JSUF # 15).

15. The Debtor received a letter dated March 18, 2017, informing her of this settlement. Based upon certain criteria (including a product implant date of October 24, 2005, and a surgical removal date of May 20, 2015), the Debtor was offered a gross settlement of $45,000 in exchange for a release of her claim (JSUF # 15).

16. The Debtor took no steps to notify the Trustee of the settlement or to amend her Schedules to disclose the anticipated recovery for her Defective Device claim after receiving the March 2017 notice of settlement (JSUF # 17).

17. On May 31, 2017, the Trustee learned of the Debtor's claim against the Defective Device manufacturers, through The Settlement Alliance (JSUF # 16).

18. On July 28, 2017, the Trustee filed a motion to reopen the case (the "Trustee's Motion") based upon the Debtor's failure to schedule the Defective Device recovery as an asset (doc. # 14). On August 25, 2017, the Debtor filed an Objection (doc. # 15) to the Trustee's Motion (JSUF # 18).

### THE MEDICAL RECORDS AND TESTIMONY

In addition to the JSUF, the parties also filed a joint list of documents for admission (doc. # 26). The admitted documents include the Debtor's medical records (Ex. 3), bankruptcy schedules (Ex. 4), contract of employment with Pulaski & Middleman, LLC, (Ex. 1), and the short form complaint (Ex. 1) and first amended complaint for the MDL case (Ex. 2).

The Court conducted an evidentiary hearing on December 13, 2017. The Debtor testified for approximately thirty minutes and answered questions regarding both her overall medical history and her specific symptoms and experience related to the Defective Device (audio available at doc. ## 27, 28).

The Debtor testified, "[her] health is not very good, and [she] sees a lot of doctors" for a wide range of ailments, including liver, kidney, heart, and lung disease (doc. # 27, at 19:04). The admitted medical records cover the period from June 2009 to April 2017, and document the Debtor's gynecological ailments, treatments, and diagnoses from a number of medical centers and practitioners (doc. # 26, Ex. 3). The medical records indicate that in June 2009, about one year before she filed her bankruptcy case, the Debtor was being treated for ongoing urinary incontinence (doc. # 26, Ex. 3, at A1). She testified she had dealt with this type of medical ailment "for many moons." (Id.) Despite having the Defective Device implanted "as a treatment for stress incontinence," the medical records indicate the Debtor experienced "chronic incontinence and urge incontinence since having her sling done . . . a few years ago" (doc. ## 22, 26, Ex. 3, at A9). During subsequent medical appointments, between 2010 and 2014, she described to her

4

health care providers persistent issues with incontinence and urinary tract infections (Id. at A1–A45). These issues caused her to need intermittent catheterization beginning in August of 2013. (Id. at A41).

The Debtor testified that during the period in which she reported ongoing issues with incontinence and urinary tract infections, her gynecologist "tried everything to help me stop it," including "cream[,] medicine" and other treatments (doc. # 27, at 24:05). She also testified the physicians she consulted never said anything about whether there was a causal relationship between the Defective Device and her ongoing incontinence and urinary tract infections (doc. # 28, at 1:28). The medical records make no mention of any issue with the Defective Device itself and do not include any conclusions that the device, or a defect within it, was connected to the Debtor's medical issues until a tentative reference on May 20, 2014. It was then, nearly four years after this bankruptcy case was filed, that physicians at Dartmouth-Hitchcock Medical Center stated they would "consider cutting her sling in the future" (doc. # 26, Ex. 3, at E4). The Debtor testified she was unaware of any potential defects with the Defective Device until 2013, when she saw a television advertisement on the topic, and it was that ad which prompted her to consult her physician about her implant (doc. # 27, at 32:15).

In her objection to the Trustee's Motion, the Debtor stated that in January of 2014, about ten months after she learned of a possible defect in the device, she also "experienced acute kidney injury due to difficulty emptying her bladder" (doc. ## 15, 26, Ex. 3, at G1). She testified she wondered whether there might be a nexus between the Defective Device and these new medical infirmities, but had not taken any steps to pursue that.

On May 20, 2015, nearly five years after she filed her bankruptcy case, the Debtor's physician surgically removed a segment of the Defective Device (doc. # 26, Ex. 3, at F6) to "treat urinary retention" (Id. at F15). Two months later, the Debtor told her physicians "her flow [was] better since the procedure" (Id. at F11). However, the Debtor also acknowledged she nonetheless was still suffering from "ongoing urinary incontinence both with urgency and with stress events," following the surgical removal of the Defective Device (Id. at F11). Medical records as recent as April 10, 2017, indicate that, following "Sling excision [in] 2015 . . . [the Debtor] [h]as ongoing urge and stress incontinence" (Id. at G16).

DISCUSSION

1. STANDARD FOR REOPENING A BANKRUPTCY CASE AND BURDEN OF PROOF IN A MOTION FOR TURNOVER

Under the Bankruptcy Code, a chapter 7 trustee is charged with the duty to "collect and reduce to money the property of the estate for which such trustee serves, and to close such estate as expeditiously as

5

is compatible with the best interests of the parties in interest." 11 U.S.C. § 704(a)(1).[2] Where the turnover of property does not occur voluntarily, the trustee "has the authority to compel an entity to turn over the property and to seek injunctive relief to protect the asset sought." In re Ir. Bank Resolution Corp., 559 B.R. 627, 643 (Bankr. D. Del. 2016) (citing 11 U.S.C. § 542).

The trustee's duty to identify and liquidate assets of the estate may extend beyond the closing date of the case. The Bankruptcy Code provides "[a] case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b).[3] A case can be reopened "on motion of the debtor or other party in interest . . ." FED. R. BANKR. P. 5010. The permissive language of § 350(b) "provides the Court with broad discretion to determine whether a party … has demonstrated good cause." In re Ross, 548 B.R. 632, 636 (Bankr. E.D.N.Y. 2016); see also In re Ruggles, 2006 Bankr. LEXIS 546, *5 (Bankr. D. Vt. 2006); Batstone v. Emmerling (In re Emmerling), 223 B.R. 860, 864 (B.A.P. 2d Cir. 1997). While the Code does not define cause under § 350(b), see State Bank of India v. Chalasani (In re Chalasani), 92 F.3d 1300, 1307 (2d Cir. 1996), among those grounds cited as sufficient to reopen a bankruptcy case, "the discovery of previously undisclosed or unadministered assets has long constituted cause to reopen …" In re Ruggles, 2006 Bankr. LEXIS at *6 (citing Miller v. Shallowford Community Hospital, 767 F.2d 1556, 1559 n.4 (11th Cir. 1985.

Here, the Trustee moved to reopen the case "to administer assets and for other cause[,]" and specified he was focused on "an undisclosed personal injury claim in the estimated amount of $45,000 relating to a transvaginal mesh claim" (doc. # 14). The reopening of this bankruptcy case "by itself, affords no independent relief, but merely gives [the] bankruptcy court the opportunity to act on a substantive request for relief." In re Segura, 2016 Bankr. LEXIS 638, *3 (Bankr. N.D. Ohio 2016) (citing In re Kirksey, 433 B.R. 46, 48 (Bankr. D. Colo. 2010)). Since the Trustee's basis for reopening the case is to obtain and administer the settlement proceeds, pursuant to § 542, the Court "must resolve the issue of whether the settlement proceeds are prepetition assets that the trustee is entitled to administer or whether the settlement proceeds belong to the Debtor." In re Ross, 548 B.R. at 636. If the Court finds the settlement funds are not property of the estate, then there is no purpose in reopening the case. If the Trustee cannot establish that the undisclosed Defective Device claim constitutes property of the estate, and must be turned over to the Trustee pursuant to § 542, the Court "will not abuse its discretion in

---

[2] It "is the trustee's duty to both the debtor and the creditors to realize from the estate all that is possible for distribution among the creditors." COLLIER ON BANKRUPTCY ¶ 704.02. Though the Court denies the Trustee's Motion in this case, it recognizes the importance of trustees' ardently fulfilling their statutory duty to maximize the distribution to creditors.

[3] All statutory references in this memorandum of decision refer to Title 11 of the United States Code ("the Bankruptcy Code"), unless otherwise indicated.

refusing to reopen the case" as then it "cannot afford the moving party the requested relief." In re Segura, 2016 Bankr. LEXIS 638 at *3 (citing In re Kirksey, 433 B.R. at 48–49).

In a motion for turnover under § 542, "the burden of proof . . . is at all times on the party seeking turnover [and] [t]hat party must establish a prima facie case." In re Weiss-Wolf, Inc., 60 B.R. 969, 975 (Bankr. S.D.N.Y. 1986) (citing Gorenz v. State of Illinois Dept. of Agriculture, 653 F.2d 1179 (7th Cir. 1981)). The leading bankruptcy treatise states that to support a cause of action for turnover, "the trustee has the burden of proof, by a preponderance of the evidence, to establish that . . . the property constitutes property of the estate." COLLIER ON BANKRUPTCY ¶ 542.03; see also In re Ir. Bank Resolution Corp., 559 B.R. 627, 644 (Bankr. D. Del. 2016). As the moving party here, the Trustee bears the burden of proof in establishing a prima facie case that the Defective Device settlement proceeds are an asset of the Debtor's bankruptcy estate.

2. WHETHER the SETTLEMENT PROCEEDS are PROPERTY of the ESTATE

The filing of a bankruptcy petition creates a bankruptcy estate, comprised of all of the debtor's property. Section 541(a)(1) states that the bankruptcy estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." Property of the estate is defined broadly and includes causes of action the debtor possessed as of the petition date. In re Ross, 548 B.R. 632, 637 (Bankr. E.D.N.Y. 2016) (citing United States v. Whiting Pools, Inc., 462 U.S. 198, 203, 205 n. 9 (1983); Jackson v. Novak (In re Jackson), 593 F.3d 171, 176 (2d Cir. 2010)); see also Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 122 (2d Cir. 2008).

Because § 541 includes "causes of action possessed by the debtor *at the time of filing*," Jackson, 593 F.3d at 176 (emphasis added), a temporal line of demarcation defines which claims are in, and which are outside of, the estate. "[C]laims that accrue to the debtor postpetition generally will not adhere to the estate and remain actionable by the debtor." Mendelsohn v. Ross, 251 F. Supp. 3d 518, 522 (E.D.N.Y. 2017) (citing Bell v. Bell, 225 F.3d 203, 215 (2d Cir. 2000)). Pursuant to Butner v. United States, 440 U.S. 48, 55 (1979), bankruptcy courts must look to state law – under which property interests are created and defined – to determine whether a cause of action had accrued as of the time of filing, thus rendering it property of the estate under § 541. However, that temporal line of demarcation is not impervious and a legal claim that accrues postpetition can be deemed property of the estate "if it is 'sufficiently rooted in the pre-bankruptcy past.'" Chartschlaa, 538 F.3d at 122 (quoting Segal v. Rochelle, 382 U.S. 375, 380 (1966)). Therefore, analysis of whether a legal cause of action is part of the bankruptcy estate has two components: the general rule that a claim which accrues after the filing of a bankruptcy petition is not part of the estate, see Mendelsohn, 251 F. Supp. 3d at 522 (citing Chartschlaa, 538 F.3d at 122), and the well-

7

established exception to that rule, which brings into the estate a claim that accrues postpetition, if it "is sufficiently rooted in the [debtor's] pre-bankruptcy past." Segal, 382 U.S. at 380.

Not every court gives equal consideration to the two components of this analysis, and "some have gone so far as to eliminate the accrual inquiry" from the analysis altogether. Mendelsohn, 251 F. Supp. at 525 n.6; see, e.g., In re Richards, 249 B.R. 859 (Bankr. E.D. Mich. 2000); In re Webb, 484 B.R. 501 (Bankr. M.D. Ga. 2012). However, "[i]n the absence of any indication from the Second Circuit that such a departure from existing case law is warranted, this Court declines to limit its inquiry in this way." Mendelsohn, 251 F. Supp. at 525 n. 6.

        A. Did the Debtor's Defective Device Causes of Action Accrue Prepetition?
              *i.*    *12 V.S.A. § 512(4) Determines When These Types of Claims Accrue*

Determining whether a claim accrued prepetition is crucial to the determination of whether it is an asset of the estate. In assessing when a claim accrues, the U.S. Supreme Court has held that, generally, a claim accrues "when the plaintiff has a complete and present cause of action." Wallace v. Kato, 549 U.S. 384, 388 (2007). In other words, all elements of a cause of action must accrue as of the petition date in order for the claim to be within the scope of estate property. As property rights "are created and defined by state law," Butner, 440 U.S. at 55, to determine the elements of a claim, and when it accrues, courts must look to state law. McCracken v. Arnot (In re Pac. Cargo Servs., LLC), 2015 Bankr. LEXIS 576, *14 (B.A.P. 9th Cir. 2015) (citing Cusano v. Klein (In re Cusano), 264 F.3d 936 (9th Cir. 2001)).

A debtor's cause of action automatically becomes property of the chapter 7 bankruptcy estate "if that cause of action had already accrued [under state law] at the time of filing." Osborne v. Tulis, 594 Fed. App'x 39, 40 (2d Cir. 2015) (citing Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 122 (2d Cir. 2008)); see also Winick & Rich, P.C. v. Strada Design Assocs. (In re Strada Design Assocs.), 326 B.R. 229, 235 (Bankr. S.D.N.Y. 2005) ("Without doubt, causes of action that accrue under state law prior to the filing of a bankruptcy petition become 'property of the estate.'"). Thus, whether the subject Defective Device settlement proceeds are property of the estate depends on when the Debtor's causes of action accrued under Vermont law.

The claims the Debtor brought, as part of the MDL case, included negligence and strict product liability claims based upon design defect, manufacturing defect, and failure to warn (doc. # 26, Ex. 2). The Court must determine when each of those claims accrued.

The Vermont Supreme Court has held that in negligence actions resulting in bodily injury, the definition of accrual set forth in 12 V.S.A. § 512 applies. It states:
    Actions for the following causes shall be commenced within three years after the

8

> cause of action accrues, and not after . . . except as otherwise provided in this chapter, injuries to the person suffered by the act or default of another person, provided that the cause of action **shall be deemed to accrue as of the date of the discovery of the injury**.

12 V.S.A. § 512(4) (emphasis added). Prior to enactment of the statutory definition set forth in § 512(4), a cause of action in tort accrued at the time of the last negligent act attributable to the defendant. Murray v. Allen, 103 Vt. 373, 376 (1931). In the 1985 Cavanaugh decision, in which the Vermont Supreme Court found a cause of action accrued on the date the plaintiff's cancer was first discovered, the court "explicitly overruled existing law and adopted the discovery rule for determining when a cause of action accrues." Estate of Hitchcock v. Tonino, 2006 WL 2709684, *4 (D. Vt. 2006) (citing Cavanaugh v. Abbott Laboratories, 145 Vt. 516, 525 (Vt. 1985)). In Cavanaugh, the court decided the existing definition of "accrue," as stated in Murray, "should be overruled, and that the term 'accrue' should be given a uniform meaning, regardless of when any particular action actually arose." 145 Vt. at 522. Under the definition given in § 512(4), and endorsed by Cavanaugh, an action for personal injury accrues when the plaintiff knows, or should have known, of "both the injury and the fact that it may have been caused by the defendant's negligence or other breach of duty." Tonino, 2006 WL 2709684, at *4 (citing Lillicrap v. Martin, 156 Vt. 165, 175–76 (Vt. 1991)). Hence, the Debtor's negligence claim accrued as of the date the Debtor discovered the injury.

The Vermont Supreme Court has also adopted the discovery-based definition of accrual set forth in § 512(4) for injury claims based on defective product liability and failure to warn. Vermont applies strict liability in a product liability action, as set forth in the Restatement (Second) of Torts § 402(A),[4] see Zeleskie v. Joyce, 133 Vt. 150, 154–55 (Vt. 1975). In a failure to warn case, the plaintiff "must prove that the manufacturer had a duty to warn, that the failure to warn made the product unreasonably dangerous and thus defective, and that the failure to warn was a proximate cause of the plaintiff's injury." Town of Bridport v. Sterling Clark Lurton Corp., 166 Vt. 304, 308 (Vt. 1997) (citing Menard v. Newhall, 135 Vt. 53, 54 (Vt. 1977)); see also McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044–45 (2d Cir. 1995) (outlining plaintiff's burden in failure to warn case under Vermont law). In both causes of action, if the claims involve personal injury, § 512(4) applies because "the applicability of that section has been predicated upon the nature of the harm for which recovery is sought and not upon the nature of the action

---

[4] "To establish product liability in a products liability action, a plaintiff must show that defendant's product (1) is defective; (2) is unreasonably dangerous to the consumer in normal use; (3) reached the consumer without undergoing any substantial change in condition; and (4) caused injury to the consumer because of its defective design." Farnham v. Bombardier, Inc., 161 Vt. 619, 620 (Vt. 1994) (citing Zeleskie v. Joyce, 133 Vt. 150, 154–55 (Vt. 1975)).

brought." <u>Kinney v. Goodyear Tire & Rubber Co.</u>, 134 Vt. 571, 575 (Vt. 1976); see also <u>Kellogg v. Wyeth</u>, 762 F. Supp. 2d 694, 703 (D. Vt. 2010); <u>Fitzgerald v. Congleton</u>, 155 Vt. 283, 583 (Vt. 1990). Indeed, the Vermont Supreme Court has gone so far as to declare, "the discovery rule in <u>Cavanaugh</u> applies even where the statute is silent on the matter." <u>Univ. of Vt. v. W.R. Grace & Co.</u>, 152 Vt. 287 (Vt. 1989). In sum, in both product liability and failure to warn claims, "where the injury is personal, the statute relating to personal injury actions applies." <u>Kinney</u>, 134 Vt. at 576 (citing <u>Maynard v. General Electric Co.</u>, 486 F.2d 538, 540–41 (4th Cir. 1973)); see also <u>Kellogg</u>, 762 F. Supp. 2d at 703 (applying 12 V.S.A. § 512 to failure to warn claim resulting in bodily injury). Since the Debtor sought recovery for bodily injury in all her claims against the Defective Device manufacturers, the determination of when her causes of action "accrued" under Vermont law is governed by the definition set forth in § 512(4).

        *ii.    Application of the State Law Definition of Accrual to the Debtor's Claims*

Under § 512(4), the Debtor's causes of action are deemed to have accrued as of the date she discovered her injury. Pursuant to the "well settled" general principles governing the accrual of actions under Vermont discovery statutes, a cause of action is generally said to accrue upon the "discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to discovery." <u>Vermont Agency of Natural Resources v. Towns</u>, 168 Vt. 449, 452 (Vt. 1998) (citing <u>Union Sch. Dist. v. Lench</u>, 134 Vt. 424, 427 (Vt. 1976)). Applying Vermont law, the Debtor's causes of action cannot be said to have accrued before March 1, 2013, the date she saw the television advertisement that first alerted her to the transvaginal mesh ("TVM") class action suits (JSUF # 11). The Debtor's medical records do not reference any link between her symptoms and a failure of, or defect in, the Defective Device prior to the June 2010 petition date. In fact, it was not until May 20, 2014 – nearly four years after her bankruptcy case was filed – that her physicians indicated they might "consider cutting her sling in the future" (doc. # 26, Ex. 3, at E4). There is no evidence the Debtor failed to pursue facts constituting the basis of a cause of action prior to filing for bankruptcy. The Trustee has presented no evidence that either the Debtor, or any of her physicians, identified a defect in the Defective Device, or recognized it as the cause of an injury to the Debtor, prior to the date she filed her bankruptcy case in 2010. Consequently, the Debtor's causes of action against the Defective Device manufacturer did not accrue, under Vermont law, prior to the petition date.

In his memorandum of law on the issue of accrual, the Trustee urges this Court to "focus upon the moment the injury occurred, not when it was discovered[,]" because "[i]n determining the date of accrual for purposes of Section 541, and ownership of a cause of action in a bankruptcy proceeding, the time of

discovery of the injury is not relevant" (doc. # 30, at 6). To support his argument, the Trustee relies upon the Fifth Circuit's decision in State Farm Life Ins. Co. v. Swift (In re Swift), 129 F.3d 792 (5th Cir. 1997). In Swift, the court described the difference between a statute of limitations and the concept of accrual, commenting, "the running of the statute of limitations is influenced by more than just the concept of accrual." Id. at 796. The Trustee's reasoning that when a cause of action accrues is not dependent on commencement of the statute of limitations period is sound, but it does not alter the Court's obligation to apply state law in determining when the Debtor's causes of action accrued. Swift did not establish a blanket rule of segregating the statute of limitations date from the date of accrual, but merely observed, "a cause of action *can* accrue for ownership purposes before the statute of limitations for that cause of action begins to run." 129 F.3d at 798 (emphasis added). Indeed, the Fifth Circuit remarked that, "[a]lthough these inquiries are different, it is often necessary to look to state law on the statute of limitations to determine when a cause of action accrues because accrual rarely is discussed apart from the issue of the running of the statute of limitations." Id. at 796 n. 18.

It is noteworthy that Swift, and most of those decisions citing its principle of distinguishing between the date of accrual and the statute of limitations period, considered state law definitions of accrual that did not contain a required discovery element. See Swift, 129 F.3d at 795;[5] In re Alvarez, 224 F.3d 1273, 1276 n. 7 (11th Cir. 2000);[6] Cusano v. Klein (In re Cusano), 264 F.3d 936 (9th Cir. 2001);[7] In re Ross, 548 B.R. 632, 636 (Bankr. E.D.N.Y. 2016);[8] Putzier v. Ace Hardware Corp., 50 F. Supp. 3d 964, 983 (N.D. Ill. 2014);[9] Calabrese v. McHugh, 170 F. Supp. 2d 243, 257 (D. Conn. 2001).[10]

---

[5] In Swift, the Fifth Circuit analyzed the date of accrual pursuant to Texas law, under which "[t]he accrual of a cause of action means the right to institute and maintain a suit, and whenever one person may sue another a cause of action has accrued." 129 F.3d at 795 (citing Luling Oil & Gas Co. v. Humble Oil & Refining Co., 144 Tex. 475 (Tex. 1946)). Under Texas law, the Swift court found that discovery is "relevant to the determination of when the statute of limitations begins to run, but it is not an element necessary for the cause of action to accrue for purposes beyond the statute of limitations." Id. at 798.

[6] Fla. Stat. 95.031(1) states, "a cause of action accrues when the last element constituting the cause of action occurs." The Eleventh Circuit found that, under Florida law, a cause of action for legal malpractice did not contain discovery as one of its three elements. See In re Alvarez, 224 F.3d 1273, 1276, 1276 n. 7 (11th Cir. 2000).

[7] Without any reference to discovery, under California law, if a claim "could have been brought," it has accrued. Cusano v. Klein (In re Cusano), 264 F.3d 936, 947 (9th Cir. 2001); see also, Goldstein v. Stahl (In re Goldstein), 526 B.R. 13, *21 (B.A.P. 9th Cir. 2015) ("In other words a cause of action accrues upon the occurrence of the last element essential to the cause of action.") (citing Howard Jarvis Taxpayers Assn. v. City of La Habra, 25 Cal. 4th 809, 815 (Cal. 2001)).

[8] A cause of action in tort under New York law "does not accrue until the debtor sustains an injury as a result of the complained act or omission." In re Ross, 548 B.R. 632, 636 (Bankr. E.D.N.Y. 2016). See also Aetna Life & Casualty Co. v. Nelson, 67 N.Y.2d 169, 175 (N.Y. 1986) (holding that a claim accrues when "all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court").

[9] Under Illinois law, a cause of action accrues when all of the elements have occurred. Putzier v. Ace Hardware Corp., 50 F. Supp. 3d 964, 983 (N.D. Ill. 2014).

[10] The court found that, "[i]n Connecticut, a cause of action accrues when a plaintiff suffers actionable harm." Calabrese v. McHugh, 170 F. Supp. 2d 243, 257 (D. Conn. 2001) (citing Champagne v. Raybestos-Manhattan, Inc., 212 Conn. 509, 521 (Conn. 1989)).

11

When following the Swift approach, courts will "look to state law on the statute of limitations," 129 F.3d at 796 n. 18, and may need to apply a state law definition of 'accrual' that incorporates the element of discovery. For example, in McCracken v. Arnot (In re Pac. Cargo Servs., LLC), 2015 Bankr. LEXIS 576, *14 (B.A.P. 9th Cir. 2015), the Ninth Circuit Bankruptcy Appellate Panel favorably cited to Cusano and Swift, but applied Oregon law, "which follows the 'discovery rule' for determining when a legal malpractice claim accrues." Id. at *17.[11] See also, In re Bolton, 2018 Bankr. LEXIS 144 (Bankr. D. Idaho 2018) (finding Idaho law requires that, for claim in warranty, negligence or strict product liability to accrue, the injury must be "objectively ascertainable"); In re Harber, 553 B.R. 522, 527 (Bankr. W.D. Pa. 2016) (finding the debtor's cause of action accrued under Pennsylvania law when she discovered she was injured by the device); In re Purcell, 573 B.R. 859, 862 (Bankr. D. Kan. 2017) (finding a cause of action does not arise under Kansas law until the discovery of the injury).

Vermont law is clear in its definition of accrual that "the cause of action shall be deemed to accrue as of the date of discovery of the injury." 12 V.S.A. § 512(4). The plain language of the controlling Vermont statute, as well as the Vermont Supreme Court's holding in Cavanaugh, indicate a clear intention to incorporate the element of discovery into the definition of accrual for a cause of action in tort, as well as for failure to warn and product liability claims, if they result in bodily injury. Cavanaugh v. Abbott Laboratories, 145 Vt. 516, 522 (Vt. 1985); Kinney v. Goodyear Tire & Rubber Co., 134 Vt. 571, 576 (Vt. 1976); Kellogg v. Wyeth, 762 F. Supp. 2d 694, 703 (D. Vt. 2010). The Trustee has not pointed to Vermont case law, and this Court has not identified any, which defines accrual of bodily injury claims in terms distinct from the element of discovery.[12] Therefore, the Court concludes the Debtor's claims did not accrue prepetition and do not come into her chapter 7 bankruptcy estate on an accrual theory.

### B. Are the Debtor's Defective Device Causes of Action "Sufficiently Rooted" in the Pre-Bankruptcy Past?

While a cause of action that accrues after the filing of a bankruptcy petition "generally [does] not become part of the estate," Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 122 (2d Cir. 2008), it is possible that such a claim could be an asset of the bankruptcy estate if "it is 'sufficiently rooted in the pre-bankruptcy past.'" Id. (quoting Segal v. Rochelle, 382 U.S. 375, 380 (1966)). In Segal, the Supreme Court considered the scope of "property of the estate" under the Bankruptcy Act. The Court found even

---

[11] Under Oregon law, a legal malpractice claim accrues "when a client knows or, in the exercise of reasonable care, should know that there is a substantial possibility that she has an actionable injury." McCracken, 2015 Bankr. LEXIS 576, at *17 (citing Kaseberg v. Davis Wright Tremaine, LLP, 351 Ore. 270, 277–78 (Or. 2011)).

[12] It is worth noting that even if this Court were to adopt the Trustee's position and find the cause of action in this matter accrues on the date of injury, the Trustee has presented no evidence showing the Debtor suffered an injury caused by the Defective Device prior to the petition date. See infra Part 2, B(i).

though the debtors, a partnership and its individual partners, could not collect a tax refund until after they filed their bankruptcy cases, the tax refund "existed at the time [the] bankruptcy petitions were filed." Segal, 382 U.S. at 380. Although the debtor's refund was received postpetition, the Court ruled the debtor's right to that asset was nevertheless "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as 'property'" of the estate as of the date of petition. Id.

Segal's analysis of the meaning of "property" under the now superseded Bankruptcy Act retains "continued vitality" in the Second Circuit and in "most other Circuits." In re Ross, 548 B.R. 632, 638 (Bankr. E.D.N.Y. 2016); see, e.g., TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.), 764 F.3d 512, 525 n. 52 (5th Cir. 2014); Underhill v. Huntington Nat'l Bank (In re Underhill), 579 F. App'x 480, 481 (6th Cir. 2014); Cook v. Baca, 512 F. App'x 810, 820 (10th Cir. 2013); Martinez v. Lincoln Gen. Ins. Co., 417 F. App'x 711, 712 (9th Cir. 2011); Fix v. First State Bank of Roscoe, 559 F.3d 803, 809 (8th Cir. 2009); Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 122 (2d Cir. 2008); In re Alvarez, 224 F.3d 1273, 1278–79 (11th Cir. 2000); Beaman v. Shearin (In re Shearin), 224 F.3d 346, 351 (4th Cir. 2000).

Under Segal's "sufficiently rooted" test, several courts have found "the accrual of a claim is not a deciding factor for determining when a property interest arises in the claim." In re Sommer, 2008 Bankr. LEXIS 767, *6 (Bankr. N.D. Ohio 2008) (citing Mueller v. Hall (In re Parker), 2007 Bankr. LEXIS 1523 (B.A.P. 6th 2007) (finding bankruptcy courts should "look at whether there is a strong nexus between the action and pre-bankruptcy events")). Under this approach, this Court must "look to the root of the claim," and determine "whether the facts underlying" the Debtor's Defective Device settlement agreement were "sufficiently rooted in [her] pre-bankruptcy past." In re Sommer, 2008 Bankr. LEXIS 767, at *7. Some courts pose the question as, did "a substantial portion of the claim elements exist[] prepetition, such that it would [be] inequitable to deprive the bankruptcy estate of this asset." In re Harber, 553 B.R. 522, 533 (Bankr. W.D. Pa. 2016).

Interestingly, a number of bankruptcy courts have recently considered the question of whether settlement proceeds from a TVM lawsuit are "sufficiently rooted" in a debtor's pre-bankruptcy past to be part of a bankruptcy estate. See, e.g., In re Hanawalt, 2017 Bankr. LEXIS 3437 (Bankr. S.D. Ohio 2017); In re Purcell, 573 B.R. 859, 862 (Bankr. D. Kan. 2017); In re Hundley, No. 09-41140-13 (Bankr. D. Kan. 2017); In re Holliday, No. 04-43151-13 (Bankr. D. Kan. 2017); In re Murphy, No. 07-40859-13 (Bankr. D. Kan. 2017); In re Castle, No. 01-23359-7 (Bankr. D. Kan. 2017); In re Segura, 2016 Bankr. LEXIS 638, *3 (Bankr. N.D. Ohio); In re Ross, 548 B.R. 632, 635 (Bankr. E.D.N.Y. 2016), aff'd sub nom,

13

Mendelsohn v. Ross, 251 F. Supp. 3d 518, 522 (E.D.N.Y. 2017). While each case is factually unique, they all include in their analysis three particular factors and the same timeline considerations. They all address how the recovery fits into the chronology of when the debtor filed a petition, when the debtor obtained a discharge, and when the court closed the case. They also all examine, in order of importance, what the evidence shows as to (i) whether and when the device caused injury to the debtor, (ii) when the debtor and medical community became aware of a potential defect in the device, and (iii) the motivation behind, and timing of, surgical removal of the device. When applied to the facts of this case, all of these factors, examined in the context of the chronology of bankruptcy case events, support a finding that the Defective Device settlement proceeds are not "sufficiently rooted" in the Debtor's pre-bankruptcy past to be an asset of the bankruptcy estate.

> *i.    Whether and When the Defective Device Injured the Debtor?*

When deciding whether a TVM implant settlement was property of the estate, bankruptcy courts weigh most heavily whether and when the device injured the debtor. Not every court adopted the unequivocal stance of the Sixth Circuit that "a cause of action qualifies as bankruptcy estate property only if the claimant suffered a prepetition injury," Underhill v. Huntington National Bank (In re Underhill), 579 Fed. Appx. 480, 482 (6th Cir. 2014). However, none of the courts found the proceeds to be an estate asset without evidence the device injured the debtor and did so prepetition. In re Hanawalt, 2017 Bankr. LEXIS 3437 at **22–23 (finding trustee had not demonstrated the erosion injury had begun as of the petition date); In re Segura, 2016 Bankr. LEXIS 638, at **9–10 (finding "no evidence that the erosion began at the time the pelvic mesh was implanted and no evidence of the cause of the erosion or that it was inevitable at the time it was implanted"); In re Purcell, 573 B.R. at 861, 867–68 (finding debtor's first indication of any problems with the device did not occur until "well after [her] case was closed"); Order Granting Trustee's Motion for Turnover, In re Hundley, No. 09-41140-13, at 4; Agreed Order Denying Trustee's Motion for Turnover, In re Holliday, No. 09-41140-13, at 2-3; Debtor's Motion to Approve Abandonment of Settlement, In re Castle, No. 01-23359-7, at 2.[13]

---

[13] The trustee collected funds for the estate in only one of the cited transvaginal mesh settlement cases, and that recovery was based upon a settlement between the trustee and the debtor (rather than a court ruling) where the evidence strongly suggested the device caused injury to the debtor prepetition. See In re Murphy, No. 04-43151-13 (Bankr. D. Kan. 2017). In Murphy, the debtor filed a chapter 13 petition in 2007, with entry of discharge and case closing occurring in early 2012. The trustee filed a motion for turnover of litigation proceeds and the debtor objected. See Debtor's Objection to Motion for Turnover, at 2. The debtor had a pelvic mesh implant in August of 2004 and, "as a result of the procedure, [she] suffered complications giving rise to a personal injury/product liability claim against the medical device provider." Id. In her objection, the debtor appeared to acknowledge the complications occurred prepetition. She argued the funds were not part of the bankruptcy estate because she had no knowledge of the connection between the device and the complications on or before the date she filed her bankruptcy petition in 2007. See Debtor's Objection to Motion for Turnover, at 1. This Court is persuaded it was precisely because the

14

Here, there is no evidence establishing the Defective Device injured the Debtor prior to the date she filed her bankruptcy petition, in 2010. It is true she reported ongoing issues with incontinence and urinary tract infections following implant of the Defective Device (doc. # 26, Ex. 3, at A1–A45), but these appear to be the very same symptoms that prompted her doctors to implant the Defective Device in 2005 (JSUF # 8). Though it is possible the Defective Device caused or exacerbated symptoms of stress incontinence the Debtor was experiencing at the time she filed her bankruptcy petition, neither the medical records nor the Debtor's testimony support that conclusion (doc. # 26, Ex. 3). There is no indication in the medical records either of any problem with the Defective Device or of a causal relationship between it and the Debtor's prepetition symptoms. The first reference in the records to the possible need to remove the Defective Device is in 2014, four years after the Debtor's bankruptcy case was closed, when physicians reported they would "*consider* cutting her sling in the future" (doc. # 26, Ex. 3, at E4)(emphasis added).

Of critical importance here is the absence of evidence connecting the Defective Device to the Debtor's symptoms. The context and evidence established by the medical records in this case are analogous to that of the Holliday and Hundley cases, in which the Bankruptcy Court for the District of Kansas denied the trustee's motions to reopen. In Hundley, the court found that although the debtor admitted to complaining "of complications of lower abdominal pain and urinary tract-infection like symptoms almost immediately post-surgery, *there are no medical records indicating a failure of the medical device*." Order Granting Trustee's Motion for Turnover, In re Hundley, No. 09-41140-13, 17-40839 (Bankr. D. Kan. 2017) (emphasis added).[14] Similarly, in Holliday, the court stated the "medical records reflect Debtor underwent numerous biopsies, ultrasounds or other procedures, *but no failure of the medical device is mentioned* in the office visit notes, phone call records, testing and pathology results, or other medical records until the time of the reparative surgery in January of 2012, nearly four years after the bankruptcy case was closed." Agreed Order Denying Trustee's Motion for Turnover, In re Holliday, No. 04-43151-13 (Bankr. D. Kan. 2017) (emphasis added). As in Hundley and Holliday, the Debtor's medical records do not describe a failure of the device, or suggest any connection between the device and her symptoms, until many years after the petition date (here, not until four years post-filing, in 2014).

In his memorandum of law, the Trustee argues that since the Debtor claims, "the alleged negligence of the Defendants, the design and manufacturing defects, and the Defendants' failure to warn

---

record supported a finding of a prepetition injury that there was a different result in Murphy.

[14] In Hundley, the debtor filed two bankruptcy petitions in 2009 and 2017 respectively. The court determined that the settlement proceeds at issue were not property of the 2009 bankruptcy estate, but were estate property in the 2017 case.

all occurred before or at the time of implant in 2005," the effective date of injury must be determined to be "the date the Defective Device was implanted" (doc. # 30). Many courts have rejected that argument and this Court also finds it to be without merit. First, a strict liability claim based on a defective product "does not accrue until there is a 'cognizable physical manifestation' of injury caused by the defect." In re Hanawalt, 2017 Bankr. LEXIS 3437, *23 (Bankr. S.D. Ohio 2017) (citing Huggins v. Stryker Corp., 932 F. Supp. 2d 972 (D. Minn. 2013)). Vermont law regarding product liability, similar to that of Ohio and Minnesota, holds that "injury and product defect are separate elements of the claim." In re Hanawalt, 2017 Bankr. LEXIS 3437, at *23; see Zaleskie v. Joyce, 133 Vt. 150, 154–55 (Vt. 1975).[15] The same rule applies to injury claims based on negligence and failure to warn. See Powers v. Office of Child Support, 173 Vt. 390, 398 (Vt. 2002);[16] Town of Bridgeport v. Sterling Clark Lurton Corp., 166 Vt. 304, 308 (Vt. 1997).[17] Because it is a separate element in each of the Debtor's causes of action, "'injury' requires more than simply being exposed to a defective product . . . [the product] must also cause some injury." In re Segura, 2016 Bankr. LEXIS 638, *9 (Bankr. N.D. Ohio).

Second, this argument fails because there is no evidence in the record establishing the Defective Device caused an injury to the Defendant at the time it was implanted, or at any time prior to the petition date (doc. # 26, Ex. 3, at E4). Exposure to a defective product alone is not enough to demonstrate injury. Some patients exposed to a defective product may "often manifest symptoms of harm only after a period of time[,]" while, for other patients, "exposure to a defective medical device [may] not result in harm. . ." In re Wagner, 530 B.R. 695, 701 (Bankr. E.D. Wisc. 2015). Because the medical records do not clearly indicate any injury connected to the Defective Device, and "is devoid of any proof that the injury developed slowly over time[,]" this Court cannot find the Debtor suffered harm from the device before she filed her bankruptcy petition.[18] In re Harber, 553 B.R. 522, 533 (Bankr. W.D. Pa. 2016). The Court therefore rejects the Trustee's argument the injury occurred on the date of implant, both because it is contrary to established Vermont law and because to do otherwise could so greatly expand the definition of

---

[15] "To establish strict liability in a products liability action, a plaintiff must show that the defendant's product (1) *is defective*; (2) is unreasonably dangerous to the consumer in normal use; (3) reached the consumer without undergoing any substantial change in condition; and (4) *caused injury to the consumer because of its defective design*." Farnham v. Bombardier, Inc., 161 Vt. 619, 620 (Vt. 1994) (citing Zeleskie v. Joyce, 133 Vt. 150, 154–55 (Vt. 1975)) (emphasis added).

[16] "The requisite elements of the cause of action [in negligence] are familiar: the existence of a legally cognizable duty owed by the defendant to the plaintiff, breach of that duty, such breach being the proximate cause of plaintiff's injury, and actual damages."

[17] "In 'failure to warn' cases, the plaintiff must show that the manufacturer had a duty to warn, that the failure to warn made the product unreasonably dangerous and therefore defective, and that the lack of warning was a proximate cause of the injury."

[18] It appears the first inkling any medical provider had of a possible connection between the device and the Debtor's symptoms was in 2014, and even then, the experts did not express a need for urgent action – as one would reasonably expect if they thought the connection was clear. They did not remove the implanted device until May of 2015 (doc. # 26, Ex. 3, at F6).

estate property that "[o]pportunistic trustees would be scrambling to latch onto every possible claim that may someday arise [from prepetition exposure], however attenuated." In re Ross, 548 B.R. 632, 640–41 (Bankr. E.D.N.Y. 2016).

The Trustee has failed to establish a "critical predicate" under Segal's "sufficiently rooted" test, namely the existence of a prepetition injury caused by the Defective Device. While ascertaining the existence of a personal injury "is far more difficult if the claim is attributable to a defective surgical implant[,]" the Trustee bears the burden of proof on that issue and he has not presented evidence sufficient to meet that burden. In re Harber, 553 B.R. at 529.

*ii.     When Did the Debtor and Medical Community
Become Aware of a Potential Defect in the Device?*

A second factor courts have considered is when a collective awareness arises that a particular device may be defective. In an effort to determine whether a cause of action (in which proof of a product's defect is an essential element) is "sufficiently rooted" in a debtor's pre-bankruptcy past, courts have often compared this date of awareness to the implant and petition dates.

In Ross, this factor assumed heightened importance because, unlike other cases considering whether a TVM settlement was property of the estate, the debtor in that case did not sustain an injury. See Mendelsohn v. Ross, 251 F. Supp. 3d 518, 522 (E.D.N.Y. 2017). Instead, the debtor's settlement proceeds had been "offered in exchange for the Debtor's pre-injury release to absolve others in advance of any liability." In re Ross, 548 B.R. 632, 641 (Bankr. E.D.N.Y. 2016). Though part of the debtor's settlement had "roots" in prepetition events through the implantation of the device, the court found that because "the most critical element that created her interest – the discovery that there was a defect with the medical device – did not occur until well after the petition date[,]" the interest was not "sufficiently rooted" in her pre-bankruptcy past to be property of the estate. Mendelsohn, 251 F. Supp. 3d at 518.

In considering the discovery of a device defect, the Eastern District of New York not only looked to the debtor's own awareness, but also to that of the medical community. In re Ross, 548 B.R. at 641 ("[I]f a debtor is not aware of any injury, and there is no recognition in the medical community that a product used by a doctor prepetition could be harmful, there is no prepetition cause of action to which a trustee can claim for the benefit of the estate."). In that case, the bankruptcy and district courts referred to a July 13, 2011 Food and Drug Administration ("FDA") safety communication regarding possible defects of surgical mesh used in transvaginal repair of Pelvic Organ Prolapse ("POP")*,* which pointed out that

17

complications in such procedures "are not rare" (doc. # 26, Ex. 2).[19] It is significant, however, that in Ross, and here, the FDA alert related to mesh for treatment of POP, and not to the mesh implanted in Ms. Ross and the Debtor. See In re Ross, 548 B.R. at 635.

In each of the recent decisions considering whether a TVM recovery was property of the bankruptcy estate, the court scrutinized both when the debtors learned of possible defects with the device and when the medical community did. For some of the courts, this was an essential element for determining whether the claim was "sufficiently rooted" in the pre-bankruptcy past. In Ross, this knowledge did not arise until 2011 (when the FDA report was issued) or 2012 (when the debtor personally learned of the possibility of defect), both of which were several years after the debtor's case was closed. In Purcell and Hanawalt, the debtors did not learn of an issue with the device until well after their bankruptcy cases closed, when a medical visit revealed mesh erosion. In re Hanawalt, 2017 Bankr. LEXIS 3437, at **14–15 (Bankr. S.D. Ohio 2017); In re Purcell, 573 B.R. 859, 867 (Bankr. D. Kan. 2017).[20]

Here, the evidence indicates neither the medical community nor the Debtor were aware of the possible defects in the Defective Device until after her bankruptcy case was closed (doc. # 26, Ex. 3). The Debtor testified she was unaware of any potential defects with the Defective Device until three years after her case was closed: "it was 2013, when I heard [the advertisement] on T.V." (doc. # 27, at 32:15). The Debtor's physicians made no reference to a possible issue with the Defective Device prior to May of 2014, nearly four years after her case was closed (doc. # 26, Ex. 3, at E4). Similarly, the FDA safety communication – which appears to have related to a different mesh product than the one implanted in the Debtor – was not issued until eight months after the Debtor's bankruptcy case was closed. Taken together, the evidence fails to demonstrate that either the Debtor or the medical community had prepetition knowledge of a possible defect in the device, and thus fails to establish this second key factor.

   *iii. The Motivation Behind, and Timing of, Surgical Removal of the Device*

The third factor the aforementioned courts each weighed was whether the device was removed, and if so, the timing of, and impetus for, its removal. The rationale is that post-closing removal of the

---

[19] Other courts have not found the need to base reasoning on the timing of the FDA release. See In re Hanawalt, 2017 Bankr. LEXIS 3437, *23 (Bankr. S.D. Ohio 2017) (noting that the debtor and trustee do not mention the FDA notice in their motions, and the Court is not grounding its decision on the timing of the FDA notice.).

[20] In a case considering a defective hip implant, rather than a TVM device, pre-bankruptcy knowledge of possible defects, without proof of injury, resulted in a determination that the claim was not "sufficiently rooted" in the pre-bankruptcy past to be part of the estate. See In re Harber, 553 B.R. 522, 533 (Bankr. W.D. Pa. 2016) (holding that a claim was not part of the bankruptcy estate despite the debtor receiving a letter, three years prior to filing for bankruptcy, informing her of the possibility that her artificial hip could eventually fail).

mesh device may warrant an inquiry into whether a debtor's prepetition medical symptoms were in fact caused by defects in the device and had just not visibly manifested themselves as of the petition date. Removal of the mesh device before a debtor files for bankruptcy, when connected to prepetition injury, on the other hand, more firmly establishes the debtor had a claim for recovery as of the petition date and would be an asset of the bankruptcy estate. See, e.g., Order Granting Trustee's Motion for Turnover, In re Hundley, No. 09-41140-13, 17-40839 (Bankr. D. Kan. 2017) (finding there were "no medical records indicating a failure of the medical device" and "the device has not been surgically removed, replaced, or repaired").

Both the timing and motivation for a debtor's removal of a device can be important in determining whether a claim has "sufficient roots" in the pre-bankruptcy past. The courts have found this factor could support a determination the recovery was not property of the estate but, alone, would not be sufficient to justify a determination the recovery was property of the estate. Here, the Debtor did not have the Defective Device removed until May 20, 2015, nearly five years after she filed her bankruptcy petition (doc. # 26, Ex. 3, at F6). In line with the majority of the cases cited, the long duration between the closing of the bankruptcy case in late 2010 and the removal of the device in mid-2015, further bolster a finding that the claim is not sufficiently rooted in the Debtor's prepetition past to come into the bankruptcy estate, under the Segal test.

The salient consideration of the Segal "sufficiently rooted" test, and particularly the factors bankruptcy courts have found to be most essential, weigh decisively against finding the Defective Device settlement proceeds are an estate asset. The Defective Device claim admittedly has "roots" in the Debtor's past, as the device was implanted nearly five years before the Debtor filed her bankruptcy case. As the Harber court accurately reasoned, however, "it is not enough that a claim be 'rooted' in the pre-bankruptcy past . . . [i]t must be 'sufficiently rooted.'" In re Harber, 553 B.R. 522, 532–33 (Bankr. W.D. Pa. 2016). Here, "the most critical elements" of the Debtor's claims "had not taken root as of the time her bankruptcy was filed" in May of 2010. Id. at 533; Mendelsohn v. Ross, 251 F. Supp. 3d 518, 526 (E.D.N.Y. 2017). The Debtor was not personally aware of any defect in the device until 2013 (doc. # 27, at 32:15). Her medical providers did not document any connection between her symptoms and a defect in the device in the medical records, or even consider removing it until May 20, 2014, four years after she filed her bankruptcy case (doc. # 26, Ex. 3, at E4). Most importantly, there is no evidence the Debtor suffered a prepetition injury from the Defective Device. Though she experienced stress incontinence and urinary tract infections after implantation, these symptoms were indistinguishable from those that prompted her physicians to implant the Defective Device (JSUF # 8). Additionally, the medical records

do not evidence any causal relationship between these symptoms and a failure of the Defective Device prior to the date of the bankruptcy filing.

### CONCLUSION

The Trustee's Motion fails under both parts of the § 541 analysis for determining whether a legal cause of action constitutes property of the estate. The Debtor's causes of action did not accrue, under the governing state law, prior to the date the Debtor filed her bankruptcy case, and the Trustee has not demonstrated the Debtor's causes of action were "sufficiently rooted" in her pre-bankruptcy past to be brought into the estate under the Segal test.

None of the three salient factors applied to determine if TVM settlement proceeds are estate assets support the Trustee's position. First, there is no proof in the admitted medical records that the Debtor suffered any injury from the Defective Device prepetition. Second, the record fails to show either the Debtor or the medical community knew of defects in TVM devices generally, or in the Debtor's specific device, until several years after the Debtor's case was closed. Finally, the Debtor's physicians showed no inclination to surgically remove the Defective Device until years after the Debtor filed her bankruptcy case.

For these reasons, the Court finds the Trustee has failed to establish the Debtor's causes of action relating to the Defective Device settlement are property of her bankruptcy estate. Accordingly, there is no asset to be administered and no cause to reopen the bankruptcy case. Therefore, the Court denies the Trustee's Motion.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law.

February 23, 2018  
Burlington, Vermont

_____  
Colleen A. Brown  
United States Bankruptcy Judge